**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

WINDELL R. KING, SR., *a member of the Saint Regis Mohawk Tribe, d/b/a First Nations Pharmaceutical, on the Saint Regis Mohawk Reservation,*

                           Plaintiff,

   - v -                                   Civ. No. 8:11-CV-281
                                                         (DNH/RFT)

UNITED STATES DRUG ENFORCEMENT AGENCY, and UNITED STATES POSTAL INSPECTION SERVICE,

                           Defendants.
_____



**APPEARANCES:**                                    **OF COUNSEL:**

MOORE INTERNATIONAL LAW FIRM PLLC   Scott Michael Moore, Esq.
Attorneys for the Plaintiff
45 Rockefeller Plaza, Suite 2000
New York, New York 10111

HON. RICHARD S. HARTUNIAN               Elizabeth Horsman
United States Attorney                            Ass't United States Attorney
for the Northern District of New York
Attorney for the Defendants
James T. Foley Courthouse
445 Broadway
Albany, New York 12207

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

### REPORT AND RECOMMENDATION and ORDER

On January 21, 2011, the United States Drug Enforcement Agency ("DEA") and

the United States Postal Inspection Service (collectively hereinafter "the Government") seized property from Windell R. King, Sr., and his business First Nations Pharmaceutical (hereinafter "FNP"). King currently moves for the return of the seized items, pursuant to FED. R. CRIM. P. 41(g). Dkt. No. 1, Pl.'s Mot. for Return of Seized Property, dated Mar. 14, 2011.[1] Rule 41(g) allows "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." On May 16, 2011, the Government responded to the Motion. Dkt. No. 8, Defs.' Resp. Pursuant to several requests by the Court, the parties further extrapolated upon their respective positions with further filings.[2] For the following reasons, the Court recommends that this Motion be **denied**.

---

[1] King's Motion for Return of Seized Items is comprised of the following: Dkt. No. 1, Mot., and Mem. of Law, dated Mar. 14, 2011; Dkt. No. 1-1, Ex. A, Treaty with the Six Nation of 1794; Dkt. No. 1-2, Windell R. King, Sr., Decl., dated Mar. 10, 2011, with Exs.; Dkt. No. 1-3, Search and Seizure Warrant; Dkt. No. 1-4, Search Warrant Inventory; Dkt. No. 1-5, Receipt of Items; and, Dkt. No. 1-6, David B. Brushwood Decl., dated Mar. 2, 2011.

[2] On May 23, 2011, King filed a Reply, which is comprised of the following: Dkt. No. 10, Pl.'s Reply, dated May 23, 2011; Dkt. No. 10-1, Case Docket of *United States v. Search Warrant*, 8:11-MJ-24(LAK); Dkt. Nos. 10-2 through 10-6, Exs., correspondence between Plaintiff and the Defendants.

On June 8, 2011, the Government filed a Status Report. Dkt. No. 11. Shortly thereafter, the Government filed a Response in opposition to the Motion, which is comprised of the following: Dkt. No. 12, Defs.' Lt-Br., dated June 15, 2011, & Dkt Nos. 21-1 through 21-4, Exs., Western District of Oklahoma case, *United States of America v. Zahary C. Williams*, CR-10-0216, Indictment and Orders.

And, finally, on June 24, 2011, King filed a Supplemental Reply, Dkt. No. 13, along with a copy of the United Nations Declaration on the Rights of Indigenous Peoples, dated September 12, 2007, Ex. 13-1.

## I. BACKGROUND

Apparently, there is little disagreement as to the facts underlying this Motion. The sole disagreement rests upon whether the January 21, 2011 search and seizure was unlawful.

King avers that he is a member of the Saint Regis Mohawk Tribe (hereinafter "Tribe") and conducted business as FNP at 191 Raquette Point Road, which is located on the Tribe's Reservation. FNP was registered only on the Reservation as a pharmaceutical business.[3] On January 21, based upon a Search Warrant[4] issued by the Honorable Larry A. Kurdle, United States Magistrate Judge, the Government entered upon the Reservation, purportedly without notice to or authorization from the Tribe's Three Chiefs, and seized FNP's computers, cellphones, documents, and boxes of pills - Fioricet®, Tramadol, Soma®, Larisoprodal, Carisoprodol. In the process of executing the Search Warrant, the actual warrant was left with King, however, King claims that the supporting affidavit of Heather R. White was not. *See generally* Dkt. Nos. 1, Mot. & 1-2, King's Decl.

---

[3] The Government proffers that FNP was not registered as a Pharmacy in any state or the United States for purposes of engaging in interstate commerce or distribution of pharmaceuticals. Dkt. No. 12 at p. 3.

[4] The Search Warrant is listed on the docket at 8:11-MJ-24 (LAK). The Application and supporting Affidavit of Heather R. White are filed under seal. The reason given for the sealing is that it relates to an ongoing District of Nevada investigation. Dkt. No. 11 at p. 2.

The bases upon which King seeks the return of all of his property are:

(1) The Government failed to comply with FED. R. CRIM. P. 41(f) insofar as it did not leave a copy of Heather R. White's Affidavit;
(2) The search and seizure violated Article VII of the Treaty with the Six Nations of 1794 (hereinafter "the Treaty");
(3) The substances seized are not controlled substances and the Government lacked jurisdiction to enter upon the Tribe's Reservation; and
(4) The seizure violated the United Nations Declaration on the Rights of Indigenous Peoples.

The Government challenges each of these positions. Succinctly, the Government argues that (1) the Treaty is not applicable to individual members of the Tribe such as King; (2) it followed the directives found in Rule 41(f); (3) the items seized are indeed either controlled substances or contain controlled substances, or considered to be a drug of concern by the DEA, and therefore the Government had jurisdiction; (4) King was not registered to distribute nor dispense prescription drugs via interstate commerce throughout the United States; and, (5) the United Nations Declaration is neither applicable nor enforceable in the context of this case.

The Government proffers that the Search Warrant was issued as a part of a contemporaneous, more encompassing national, multi-district investigation into the on-line distribution of controlled substances and mail fraud.[5] It is alleged that FNP is a

---

[5] Providing an example of the ongoing multi-district investigation, the Government cites to the Western District of Oklahoma case of *United States v. Zachary C. Williams, et al. See generally*, Dkt. No. 12, Exs., *United States v. Zachary C. Williams, et al.*, CR-10-216-HE. Zachary Williams
(continued...)

"fulfillment pharmacy located on [the Reservation] believed to have been filing and distributing prescription drugs in violation of the criminal and regulatory laws of the DEA and the United States Food and Drug Administration [hereinafter "FDA"] as to mandatory physician-patient relationship, and the United States Postal Service [hereinafter "Postal Service"] as to mail fraud and conspiracy to defraud the United States." Dkt. No. 8 at p. 2. Participating in the January 21, 2011 search and seizure were DEA, the Postal Service, the FDA, Homeland Security Investigations agents and the Tribe's Police Department. Dkt. Nos. 8 at p. 1, & 12 at p. 2, n.1. A copy of the Search Warrant and an inventory of the items seized were left with King and the Government concedes that White's Affidavit was not left primarily because it contains sensitive information regarding the on-going multi-district investigation; and for that reason, is filed under seal. Dkt. No. 8 at p. 3; *see also* Case Docket 8:11-MJ-24 at Dkt. No. 5.

Initially, the Government asked the Court not to issue any decision relative to this Motion, at least not for 120 days, since Judge Kurdle previously granted the Government 120 days to explore the computers and scan and copy their contents with the expectation that many of the items seized would be returned to King and FNP

---

[5](...continued)
and others were charged with distributing pharmaceuticals on the Ponca Nation of Oklahoma Reservation, as well as through interstate commerce, in violation of 21 U.S.C. § 846, 18 U.S.C. § 371, 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2, and 21 U.S.C. § 853.

thereafter. Case Docket 8:11-MJ-24, Dkt. No. 6. Now, the Government advises the Court that it intends to return the computers, most, but not all, of the documents seized, but none of the prescription drugs. Dkt. No. 11 at p. 3. Previous Government attempts to return the computers to King miscarried for various reasons and the parties were unable to coordinate the return of that property by the time this Motion was fully briefed. *See generally* Dkt. Nos. 8 & 11. Even though most of the items seized will be returned, because the Government does not intend to return the prescription drugs, the Motion remains ripe for our review.[6] The Court will address the issues *seriatim*.

## II. DISCUSSION

### A. Federal Rule of Criminal Procedure 41(f)(1)(C)

"To prevail on a [Rule 41(g)] motion, a [petitioner] must demonstrate that (1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended." *In re Application of Madison*, 687 F. Supp. 2d 103, 109 (E.D.N.Y. 2009) (alteration in original; citations omitted). The *sine qua non* of

---

[6] As the Court was originally drafting this Report and Recommendation as Memorandum-Decision and Order, on July 20, 2011, the Government filed a Status Report with Judge Kurdle. A courtesy copy of that Status Report was filed on this case docket. Dkt. No. 14, Defs.' Status Report. In sum, the Government advises Judge Kurdle that (1) the documents have been scanned and are available for King to review; (2) all of the drugs being held contain Butalbital (Fioricet®); (3) the eight computers seized have been and remain available for King to retrieve; (4) the seized cellphones have been returned to King; (5) the Government possesses mirror-images of the hard-drives and cellphones. Lastly, an investigative analysis continues. *Id.*

this three-prong test is that a petitioner may not recover property if it is found to be contraband. *Genao v. United States*, 2009 WL 1033384, at *4 (S.D.N.Y. Apr. 16, 2009).

During the course of executing a search warrant and seizing items thereto, "[t]he officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property." FED. R. CRIM. P. 41(f)(1)C). King relies exclusively on the proposition that the executing officers failed to comply with this mandate. There is no disagreement that the Government left a copy of the Search Warrant and a receipt of what was taken with King and FNP. *See* Dkt. Nos. 1-3, Search Warrant, & 1-4, Inventory Sheet. Because the Search Warrant indicates that it was issued based upon an Affidavit of Heather R. White, Dkt. No. 1-3, King posits that White's Affidavit should have been served upon him as well; since it was not, the search and seizure are unlawful.

A fair reading of the statute does not support King's postulation. All that the executing officers were compelled to do was leave <u>only</u> a copy of the search warrant and a receipt of the items seized. Neither the advisory committee notes nor any precedent support King's position that he was entitled to White's Affidavit at the time of the search and seizure. It is neither traditional, historical, nor logical that the

Affidavit which was instrumental in the issuance of a search warrant be provided to the owner of the premises being searched. Furthermore, King does not challenge the validity nor the adequacy of the Search Warrant; he only complains about the absence of White's Affidavit. Because the Search Warrant and the supporting Attachments detail with sufficient particularity the place to be searched and the items to be seized, there was no other requirement that the Affidavit be disclosed as well. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (standing for the proposition that a search warrant that utterly fails to describe the persons or things to be seized is invalid on its face, but further noting that the Fourth Amendment requires particularity in the warrant, not the supporting documents); *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990) (finding that in meeting the particularity requirement of the Fourth Amendment, the warrant is to be construed in light of an illustrative list of seize-able items). Directly on point with our facts and highly persuasive are two guiding pronouncements from the Ninth Circuit, where warrants were served without the related affidavit. In 2003, the Ninth Circuit addressed a Rule 41 motion where a search warrant and attachments where left with the owner of the searched residence but not the agent's affidavit. *United States v. Celestine*, 324 F.3d 1095 (9th Cir. 2003). "[I]f the face sheet [of the warrant] and attachments clearly state that the agents have lawful authority to conduct the search and specify the location to be searched and the items sought, the affidavit

supporting the probable cause determination need not be served at the time of the search." *Id.* at 1101. In a subsequent and similar case, *United States v. Smith*, 424 F.3d 992 (9th Cir. 2005), the Ninth Circuit found that the affidavit was not related to the particularity requirement and thus "the warrant without the affidavit was facially valid standing alone. . . . The failure to attach the affidavit [at the time of the search and seizure] does not require suppression." *Id.* at 1008. Considering that our Search Warrant and attachments comply with Fourth Amendment requirements, and were left with King, the Court finds, at least for this reason, that the search and seizure were not illegal.

Considering the remaining requirement for a successful 41(g) motion, the Court finds that the seized prescription drugs are contraband, *see infra* Part II.D, and that King does not have a constitutionally recognized possessory or privacy interest in that contraband, notwithstanding his claims to the contrary. *Illinois v. Andreas*, 463 U.S. 765 (1983). The Court recommends that the Motion be **denied** on this account.

### B. Treaty of 1794

The second ground upon which King gainsays the lack of jurisdiction to conduct such search and seize the listed items is Article VII of the Treaty with the Six Nations. Article VII states in part,

> Lest the firm peace and friendship now established should be interrupted by the misconduct of individuals, the United States and Six Nations

agree, that for injuries done by individuals on either side, no private revenge or retaliation shall take place; but, instead thereof, complaint shall be made by the party injured, to the other: By the Six Nations or any of them, to the President of the United States, or the Superintendent by him appointed: and by the Superintendent, or other persons appointed by the President, to the principal chiefs of the Six Nations, or of the nation to which the offender belongs: and such prudent measures shall then be pursued as shall be necessary to preserve our peace and friendship unbroken; until the legislature (or great council) of the United States shall make other equitable provision for the purpose.

Dkt. No. 1-1, Treaty, Art. VII.

King stakes the position that because he is a member of the Mohawk Tribe, he "is entitled to invoke the protection of the [Treaty]." Dkt. No. 13 at p. 2 (citing to *Puyallup Tribe, Inc. v. Dep't of Game of Wash.*, 433 U.S. 165, 171 (1977)). King further relies upon the contention that the Government did not comply with the Treaty insofar as it did not lodge a complaint with the Three Chiefs nor request and receive authorization to enter upon the Reservation. Dkt. No. 1 at p. 4. Conversely, the Government contends that King lacks standing to speak on behalf of the Tribal Council about any breach or offense of the Treaty. Dkt. No. 12 at pp. 4-5.

King can find no comfort nor legal justification for his entreaty that as a member of an Indian Nation, he is imbued with the authority to either invoke the Treaty as immunity against prosecution or leverage it as a tool to sue. In fact, precedents from the United State Supreme Court and courts within this Circuit emphatically find to the contrary. Unless an individual or entity can establish that it acts as an arm of the Tribe,

those acts are not properly deemed to be those of the Tribe. *Gristede's Food, Inc. v. Unkechuage Nation*, 660 F. Supp. 2d 442, 477 (E.D.N.Y. 2009) (citing, *inter alia*, *Allen v. Gold County Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006)).

King is rather audacious in citing *Puyallup Tribe, Inc. v. Dep't Game of State of Wash.*, 433 U.S. 165, in support of his claim that he has authority to invoke the terms of the Treaty. In *Puyallup Tribe*, the State of Washington Department of Game brought an action seeking declaratory judgment that members of the Puyallup Tribe were not exempt by virtue of a federal treaty from the application of the state's fishery conservation measures. The Supreme Court found that, in the absence of a waiver, a state court could not exercise jurisdiction over a recognized Indian tribe, however, the state court had proper authority to adjudicate the rights of individual tribal members over whom it had obtained personal jurisdiction. With the clearest of reasoning, the Supreme Court stated that "even though the individual defendants were members of the Tribe and therefore entitled to the benefits of the Treaty of Medicine Creek, the treaty as construed by this Court does not confer the complete individual immunity they claim." *Id.* at 171. Even though *Puyallup Tribe*, as well as other cases, solely addressed the tribe's, and even its members, invocation of sovereign immunity from prosecution, the reasoning and precedential value is unequivocally analogous to our facts and supportive of this Court's findings that the Government's action did not

trample upon nor infringe the Treaty. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (citing *Puyallup Tribe*, 433 U.S. 165, for the legal axiom that tribal sovereign immunity does not extend to individual members of a tribe). Moreover, an apparent corollary to a discussion on sovereign immunity is that federal and state governments may "have legislative jurisdiction over the off-reservation conduct of Indian tribes, and even over some on-reservation activities." *Kiowa Tribe of Oklahoma v. Mfg. Tech., Inc.*, 523 U.S. 751, 762 (1998).[7]

More specifically, courts within this District have unanimously rejected the notion that individual tribal members have standing to sue under or even raise terms of a treaty. In *Canadian St. Regis Band of Mohawk Indians v. State of New York*, 573 F. Supp. 1530 (N.D.N.Y. 1983), the Honorable Neal P. McCurn, Senior United States District Judge, found that an individual member of an Indian tribe, or even a group of individuals banding together, clearly lacked standing to assert claims on behalf of himself as well as the tribe based upon violations of the Nonintercourse Act. *Id.* at 1537 & 1538. Likewise, individual members of an Indian tribe's attempts to sue the

---

[7] In this respect, the Second Circuit has recognized the parameters upon which concurrent federal and state jurisdiction may ly in terms of enforcing their respective laws against individual tribal members. *United States v Cook*, 922 F.2d 1026 (2d Cir. 1991); *see also United States v. White*, 237 F.3d 170, 172 (2d Cir. 2001) ("With certain exceptions federal laws of general applicability are presumed to apply to American Indians, regardless of whether they reside on or off a reservation.") & *United States v. Markiewicz*, 978 F.2d 786, 797-98 (2d Cir. 1992) (listing a myriad of federal statutory crimes applicable to tribal members).

State of New York under the Albany Treaty of 1664 fell short of their mission for the very same rationale. *Bess v. Spitzer*, 459 F. Supp. 2d 191, 199 & 202 (E.D.N.Y. 2006) (citing *Puyallup Tribe*, 433 U.S. at 173 and further noting that the principle of tribal immunity does not apply to individual Indians in the same manner and way that it may apply to Indian Tribes); *Smith v. Cuomo*, U.S. Dist LEXIS 97105, at *21-22 (S.D.N.Y. Sept. 30, 2007) (finding that the Albany Treaty of 1664 did not bestow any rights upon individual tribal members).

Relying upon the considerable weight of the precedents before us, the Court finds that King has not demonstrated that he hold any office or possesses any tribal authority to herald any provision of the 1794 Treaty, on behalf of the Tribe, in declaring the January 21, 2011 search and seizure unlawful and invalid. This Court finds this ground equally unavailing. Also, this Court has not forgotten that the Government represents that the Reservation Police participated in this Search and Warrant, lending further credence to the Government's legitimate exercise of police power under these circumstances. Therefore, the Court recommends that the Motion be **denied** on this ground as well.

### C. United Nations Declaration on the Rights of Indigenous People

Probably as an afterthought, but certainly conspicuously as an attempt to be co-joined with the purported privileges believed to be viable to individual members under

the 1794 Treaty, King, as an indigenous person, raises that the Government is obligated to observe his human rights. Dkt. No. 13 at pp. 3-4. King points to Article I for the relief that he seeks:

> Indigenous peoples have the right to the full enjoyment, as a collective or as individuals, of all human rights and fundamental freedoms as recognized in the Charter of the United Nations, the Universal Declaration of Human Rights and international human rights laws.

Dkt. No. 13-2, United Nations Decl.

In this respect, King infers that his rights, as supposedly embedded within the Treaty, are more profoundly effected by the alleged unlawfulness of a search and seizure.

Evident is King's glaring lack of confidence in his casual presentation of this contention in support of his Motion, and we wonder why he bothered. He made no effort to present any precedent, nor could he, nor did he attempt to develop a reasonably cogent, first impression argument. Instead, King resorted to summing up the point with a couple of paragraphs comprised mostly of quotes from the United Nations Declaration. Laudatory as the United Nations Declaration may be, its Articles are only aspirational and not enforceable in a federal district court. *See e.g., Sosa v. Alvarez-Machain*, 542 U.S. 692, 734, (2004) (cited in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 131, n.34 (2d Cir. 2010). The Court finds this argument utterly indefensible and recommends that the Motion be **denied** on this ground

## D. Controlled Substances

Next, King argues that the seized prescribed drugs are not controlled substances, and therefore the search and the seizure were unlawful. The prescribed drugs seized are Fioricet® (also known as "butalbital, acetaminophen, and caffeine"), Tramadol, and Carisoprodol (also known by the trade name Soma®). Dkt. No. 1-6, Brushwood Aff. at ¶ 6-8. King's expert, David R. Brushwood, opines that these drugs are not classified as controlled substances and are not subject to restrictions applicable to controlled substances. *See generally id.*

The Government's justification for the seizure of these drugs are several fold: (1) as we noted earlier, because King does not have a valid license to practice pharmacolgy, he lacks the legal authority to dispense these prescribed drugs off-reservation and on-line; (2) these drugs are known to be abused by the public and fall within the DEA's list of drugs and chemicals of concern; and (3) indeed, these drugs, or their most prominent compounds, are listed as controlled substances. *See* Dkt. Nos. 8 at pp. 3-4, n.2-4, & 12 at p. 5.

Congress enacted 21 U.S.C. § 812, which establishes schedules of controlled substances that have high potential for abuse. There are five specific schedules. Fioricet®, a prescribed drug, is the brand name for "butalbital, acetaminophen, and caffeine." Butalbital is a derivative of barbituric acid which is considered to be a

controlled substance, pursuant to 21 U.S.C. § 812(c), Schedule III, and possibly Schedule IV. Schedule III(b)(1) finds that any substance which contains any quantity of a derivative of barbituric acid is a controlled substance, and Schedule IV lists barbital, another name for butalbital, as a controlled substance. For some administrative purposes, Fioricet® may be exempt from the controlled substance classification, but nonetheless must be distributed by a person who is a valid licensed pharmacist. "Except as authorized . . . it shall be unlawful for any person to manufacture, distribute, or dispense, or possess with intent to distribute or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). A dispenser of these types of drugs is "a physician . . . or other person licensed, registered, or otherwise permitted, by the United States or [other] jurisdiction . . . to distribute, [or] dispense . . . a controlled substance[.]" 21 U.S.C. § 802(21). There has been no showing that this drug under these circumstances falls within the rubric of "administrative purposes only." As it stands, Fioricet® is a controlled substance regulated by the DEA and, if a person does not have a valid pharmaceutical license, such as King does not, to distribute, dispense, or possess, there is reasonable cause to believe that they may have contravened federal laws and regulations.

Tramadol, commonly known as Ultram®, is prescribed to treat pain. Simplistically, it is an opioid with morphine-like activity, which has an addictive

nature. In the scheme of things, opiates are considered to be a controlled substances as noted on Schedule II and are a drug of concern. 21 U.S.C. § 812(c), Schedule II.[8] Tramadol, itself, is not classified as a controlled substance at the federal level but depending on various factors, which we will not explore at this pont, it may be considered narcotic drug, especially within certain states. Similarly, Soma®, the brand name for Carisoprodol, is developed on the basis of meprobamate. While meprobamate is classified as a controlled substance as found in 21 U.S.C. § 812(c), Schedule IV(7), Carisoprodol is not specifically noted as such on the federal level. Yet, this drug is also found to be abused, highly addictive, noted as a controlled substance in several states, and subject to close scrutiny by DEA and FDA.[9] Nonetheless, Soma® must be dispensed only by prescription by a properly certified professional.[10]

There is reasonable cause to believe that dispensing these drugs, especially Fioricet®, a Schedule III controlled substance, without a valid United States license as a pharmacist, may violate 21 U.S.C. §§ 841(a)(1).[11] There is sufficient legal

---

[8] *See* www.deadiversion.usdoj.gov/drugs_concern/tramadol.htm.

[9] *See* www.deadiversion.usdoj.gov/drugs_concern/carisoprodol.htm.

[10] This drug has been under review by the DEA as a potentially listed Schedule IV drug.

[11] Because of its similarity to our case, the Government has submitted for our review the Western District of Oklahoma case of *United States v. Williams et al.*, CR-10-216-HE. Williams
(continued...)

justification for the search and seizure of King's property. Because these drugs are readily perceived to be contraband, the Court finds that King is not entitled to their return at least in this forum and recommends **denial** on this Motion.

### III. CONCLUSION

The Court finds that King has failed to meet the elements for a Rule 41(g) motion. As noted above, the seized property is reasonably viewed as contraband, which the Government does not contemplate returning, the seizure does not appear to be illegal, and the Government's need for the property as evidence has not expired. *In re Application of Madison*, 687 F. Supp. 2d 103, 109 (E.D.N.Y. 2009). There is no legal basis for the Court to interfere with the Government's reasonable evaluation to maintain possession of the contraband for evidentiary purposes and the Government's interest in the property endures at least at this juncture of the investigation. *Krimstock v. Kelly*, 464 F.3d 246, 253-355 (2d Cir. 2006).

Accordingly, it is hereby

**RECOMMENDED**, that King's Motion, Dkt. No. 1, **be denied** and that a Judgment dismissing the action be issued; and it is further

---

[11](...continued)
and others, who purportedly possessed a pharmacy license from the Ponca Nation, but not one from the United States or any other state, was charged with the illegal distribution of controlled substances and other prescribed drugs, such as Fiorcet®, Soma®, and Tramadol, outside the reservation in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. *See* Dkt. No. 12.

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date: August 18, 2011
      Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge